Please the court. My name is Andrew Bibiano on behalf of Mr. Kessack. I want to reserve three minutes rebuttal if the court allows. And also want to thank the court personally for being accommodating of my medical schedule and needs and letting us do the argument this morning. Understand this case, we need to take ourselves back to the first week of June 2017. At that time, Lori Cron is Mr. Kessack's substance abuse treatment provider. And she does not want to discharge Mr. Kessack. She wants to keep him in treatment. We know this because she testified in a hearing a few months later that even though Mr. Kessack had been removed from work release, she wanted to help him stay in treatment and was willing to speak to providers in the community to make that possible. And there's no reason she could not have done so. Mr. Kessack had finished his last class at Brownstone work release and was scheduled to continue treatment when he was released to the community, which at that point was only a month later. He didn't get a chance to be released on his initial discharge date of May 24th, but it was moved to early July, July 9th, I believe. But Ms. Cron said she didn't get the opportunity to do what she wanted to do and keep him in treatment because CCO Webb made that decision for her. Once she decided, Ms. Webb, that Mr. Kessack was done, the quote from Ms. Cron was, quote, there's nothing I can possibly help you with. She continued later, I wanted to, but I can't, end quote. Now, so she was forced to do this because CCO Webb doggedly pursued this course of action. I'm sorry, doggedly pursued. She didn't cause the 813, right? She did not. That the only person who caused the 813 was your client and his partner, right? Correct. And your client admitted to the 813. Correct. Client denied the 814, but admitted to the 813. That is also correct. So how is what the, I'm not sure what the title is, the officer, how does that relate to the fact that your client admittedly, for his own reasons, violated the conditions and admitted to it? And that it is a legitimate, penological goal for somebody who has violated before when he was on work release, right? Correct. He did an 813 before, right? I believe so, yes. And to have him answer for the consequences of a second 813, how is that not serving whatever the test is, a legitimate goal of the state that we shouldn't second guess? Because your honor, there is absolutely no penological goal, even with an admitted 813 infraction, to remove Mr. Kesick from drug treatment. There's no, there's no penological goal for somebody who has 17 prior felonies, a high violent classification, had done the same thing before. There's no legitimate goal to say, you can't do this. If you do this, you're going to be punished. And we want to make sure that other people who might think of doing this would know that if they do it, they're going to be punished. So is any part of my factual predicate incorrect about your client's prior record? The record itself is correct. The reality is all of those facts were known when Mr. Kesick was given a dose of sentence by the sentencing court. Right. But it wasn't known that he would commit another 813. And then the 813, it was known that that was his record when the hearing officer, it was known he did it once, but somebody made a decision to give him another chance. It wasn't known that he would commit another 813. Right. Your honor. I think if I can analogize here, if a judge were sentencing, instead of hearing officer, Mr. Kesick for the 813 violation, the judge had all that information in front of them. The first time. No, the second time. Okay. Every, every hearing officer ever has had the information and they, and the hearing officer there said, here is your punishment in light of all of your history. And I have all this conduct. Your punishment is a loss of 30. So days of good time credits, the end hearing officer did not say. So is it your view that in this circumstance, someone's saying they said to me that they were going to do this for a retaliatory motive that with these same facts as to your client's record and the admitted violation that, that your client's saying, this is what she said to me, that that creates a disputed issue of fact. So that a case like this in a confinement setting needs to go to trial. Yes. Yes. And the, I'll get. It's not just that. I mean, weren't there other things that, I mean, he filed a successful grievance shortly before and, and also that the other person who committed an eight 13, she had a different, she didn't get punished at all. Thank you. That is, there's many more facts beside. I wanted to answer the question directly, but yeah, there are many more facts suggesting a retaliatory motive for admission. The question is really whether we send this back because there's enough evidence of pretext, even though the things that judge Bennett just recited are legitimate, penological here. They weren't really the reason she was really just upset about him having filed a successful grievance against her. Your honor. I think there are multiple reasons to send this back. I do want to go back to that point. The penological goals are the proper test for a first amendment case in the context of a prison setting. Okay. So you're changing your argument. Well, I think I want, and I think you're right. I tried to argue in the brief that Nevis is not applicable. Then I argued an alternative. Why, even if we did that test, it's not applicable, but we never argued that. I think I argued in the Navis case, I took the again, as I does the novel review, I took that and presumption that neighbors is going to be applied. And I thought it worked with the test, but we did argue that there was not a probable cause. And that this was a case where we said Mount healthy should be the proper standard to be applied here. And we're kind of followed the Nevis reasoning when the court did so, but always said that Mount healthy is the proper standard, which does not require the probable cause proof. But really the troubling part of this case is the, is a presumption that if Mr. Keswick did anything wrong, there's no limit to what CCO web can do to punish him for it. That the fact that it was, it was heard and cited and punished by a hearing officer within the policies and the guidelines and the limitations and what can be done under this offense, that seems to be irrelevant to whether she can then further beyond that after that's done and completed and make affirmative efforts to get him discharged from treatment for the express purpose of enabling her to then seek an additional charge of 762, which would be equivalent to a 30 month prison sentence for his walk in the park. That is actually very concerning to me. And if I were a, if this case were to stand on the way it's written, I would not be able to, as a plaintiff civil rights lawyer, advise anybody in the prison context to make any complaints against anybody in power because of the, if they go on to make a mistake in the future, there's no limit to what can be done to them. Well, I mean, the, the regulations that your client signed on to said that, for example, you can be terminated if you commit an eight 13, right? No, no. They said that if you're changing, if you're terminated from treatment, if you're terminated, administratively terminated from treatment, your dosa can be revoked. But your dosa can be revoked for an eight 13, right? I do not believe so. You're out of the regulations. Don't the eight 13, it was within the policies about progressive discipline. And there's a chart about what the first offense should be. It's 30 days after that, it could be 60 days and then 90 days. There's a whole entire system in which the DOC is supposed to use progressively stronger disciplines to when people commit offenses. And it makes sense within the context of the entire purpose of dosa. We create this process. We're trying to make people safer by addressing the root causes of crime by getting them treatment for their drug addiction. Well, I'll ask your friend, maybe I'm misreading 137, 25, 30, which lists this as a serious violation and what the potential sanctions are, but it's possible I'm misreading the reg. Well, in this case, though, what's clear is that he was still scheduled to be released to the community on July 9th, I believe, even after the sentencing on the eight 13, that was the hearing officer's decision. If Ms. Webb had done nothing, even if she had kept him in prison the entire time until July 9th, he was scheduled to be released on July 9th to the community where he'd pick up his drug treatment, keep working and keeping his life back together. If she'd done nothing, she took affirmative steps, not based on what the judge told her or the hearing officer told her to do. She took affirmative steps to make sure he was discharged from treatment against his treatment provider's wishes so that she could add that extra 30 months of prison times to his life. And we have evidence that that was motivated by retaliatory animals. If that's not enough to get past summary judgment, I don't know how anybody else can feel complaining about their first amendment freedom of religion rights, because if they mess up again, which they probably will, because people are imperfect, especially people who are going through the prison sentence system, the chain of horribles seems to have no limit. A 30 month sentence for walking the park is actually a permissible outcome. Well, he got the 30 month sentence for the three felonies he was convicted of. Right. He got the suspended 30 months. Right. But I mean, that's why it was 30 months, because he had 17 priors and he was found guilty of three felonies. Right. But again, everyone in the prison context is going to have that hanging over them. The question is whether they're allowed to exercise their first amendment rights and complain about things that are unconstitutional without fearing that that axe is going to fall. And Mr. Bruce and Bruce for Ilst had to worry about that when he complained and filed kites against the officials. But I said in those cases that all that was offered were generalized reasons. Right. None of those cases had an admitted violation. Right. Well, no, I think the court in the Bruce case said that even if he ended up where he's supposed to be, the court took no position on whether it was OK for him to have put in that higher custody as a gang member. It was still a matter of the fact that the system can't use the prison system, can't use that as a as a pretext for discrimination. And again, going back to the policy, the DOC has never actually put forth the policy that says that Ms. Webb was supposed to get him terminated from treatment. The DOC is not in the business of not writing things down. If there were a policy that said that she was supposed to do what she did, they would have put it into the record by now. She says something. Maybe I'm not. So the timeline. OK, so he gets he gets the 813. And. And did Webb recommend that he he moved into total confinement, the total confinement was recommended the date of the violation. OK, so that was the total confinement was for the violation, right? Pending the hearing on violation. That is the justification that's still in the record today that he was confined for that week pending that hearing. OK, so then I might not say Webb then terminated Kessack from the required substance abuse program, which triggered the 762 infraction, which caused the dose of sentence and returned to prison instead of community custody. So what what was the basis for terminating him from the substance abuse program? The only basis was Miss Webb's continued requests to Miss Cron that he be terminated so that she may pursue 762 charges against him. It sounds like it's not true, but that's actually what she writes in the record. She writes three times in her chart notes, emailed Miss Cron so that I can get her discharge paperwork so that I may bring a 762 infraction. What was the basis for that? Why did I mean, what's the base? Is there? I heard Judge Bennett reading from some statutes. What was the regulation or basis for doing that? That's the thing. There isn't one. There is no statute or policy that says that if someone has been punished with a loss of good time credits, they have to lose their drug abuse treatment. They don't have to. There's nothing that says they should. There's nothing in the statutory scheme which says that if you're incarcerated pending your violation hearing that you can get a 762. There's a 762 is based on termination from treatment. So if the incarceration causes the treatment provider to terminate you, then the CCO can respond by bringing a 762. The incarceration did not cause a treatment provider to terminate Mr. Kasich. There's no treatment left to be provided and she didn't want to do it, even if I'm saying in jail, she wanted to work with the community. The treatment provider has to make that initiative to terminate somebody. And so there is no policy that's critical here that says that Ms. Webb must have or should have done what she did. I see I only have about 30 seconds left, so I would reserve that time I have for rebuttal. Thank you. First one to get to say you're at good afternoon, your honors. Heidi Holland on behalf of Justine Webb and the Department of Corrections. And before I start, I have to address the last comment from my friend, that there is no policy or regulation that would result in Mr. Kasich's termination from chemical dependency treatment. And that is patently incorrect. This case involves a repeat felony offender who in 2016 was given one last chance when the court sentenced him to his second dosa. At his sentencing, the trial court had biased him as this court has recognized that any offender who is administratively terminated from the program shall be reclassified to serve the unexpired term of his sentence. Under dosa, that's one strike and you're out. But nevertheless, Mr. Kasich committed two high level infractions and his admitted conduct is the first domino that fell and caused the subsequent mandated chain reaction. This court should affirm summary judgment for three reasons. First, he cannot make out the essential elements of his causes of action. Second, defendants are entitled to quasi-judicial immunity. And third, Ms. Webb is entitled to qualified immunity. So if I can correct the record as far as the context for the things that happened, because there were several misstatements of the fact. First, DOC policy requires that work release offenders who have been charged with high level offenses be held in total confinement pending their hearing. And that can be found at the supplemental excerpt of the records, page 15. That is the department's policy, let's see, yes, excuse me, 460.130. And it begins on page SCR 11. And then the part that I'm referring to is on page 15. Now, interestingly enough, for dosa offenders, and this is where Mr. Kasich differs from the person that he was with Ms. Orr, any infraction that resulted in a chain of change of custody mandates an administrative termination from chemical dependency treatment, mandates automatically. And that can be found at SCR 105 through 106. Again, I'm sorry, Your Honor, you were going to ask, what are you referring to? So that is, if I recall correctly, is the letter that, excuse me, it's the treatment conditions that Mr. Kasich signed on April 19th. So more than a month prior to his termination. And in that letter, there are various things and there's conduct that may result in termination. And then there's conduct that says will, and there's an emphasis in the original and it's will automatically will result in an administrative termination from chemical dependency treatment. That's in the record. So, and again, because Mr. Kasich is a dosa offender, that mandated administrative termination is a violation of the conditions of his sentence, which means automatically that he is required to serve the remainder of his term. Those were all automatic decisions. There was not, so it's a community corrections officer who Ms. Webb is. She did not railroad or manufacture anything. These were all policies that by virtue of his conduct became automatic. Well, they could have overlooked the 813 if they wanted to, right? No, your honor, they could not. So she is required by policy to respond to a known violation. And so there are two violations and they're admitted violations and they're both high level. It's an 813 and the 814. And to be clear, he did not deny that. So an 813 is being out of bounds, being somewhere where you're not supposed to be. An 814 is being with somebody that you're not supposed to be with. He did deny that, didn't he? In his deposition, he said, and you denied being with an unauthorized person. Is that correct? Correct. SCR 137. So what he denied was that he hadn't planned it in advance. At every one of his infraction hearings, he admitted the underlying conduct, meaning that he knew that where he wasn't supposed to be with somebody he wasn't supposed to be with. The basis for his denial at the infraction hearings was that he had not pre-planned that meeting. But regardless, these policies, they absolutely required that if you commit the 813, that you have to be by policy to respond to known violations. This was a known violation and she is required to respond to that. At those hearings, as your honor indicated, he admitted to the 813, the 814, which again is being with the individual. He denied because he said he had not planned on meeting with her, but ultimately he was found guilty of both. And the appeal panel decisions confirmed those convictions. I don't know if it's the right word for an infraction hearing, but that those upheld those guilty findings. So if your honors, if I may turn to the why he didn't make out the elements of his causes of action. So he's brought malicious prosecution, false imprisonment, and a first amendment retaliation claim with the corresponding state law claims for malicious prosecution and false imprisonment. As to those, the false imprisonment and malicious prosecution, probable cause is a complete defense to those two types of causes of action. So that would leave us with the first amendment retaliation claim. We have argued that the Nieves-Hartman standard should be applied. And I understand that the court takes issue with that. And so preemptively, I will say that even if the court were to disagree, that that's the standard to apply, even under Mount Healthy, that the state would prevail. However, it's our position that the Nieves-Hartman standard is the proper one because the same causal complexities that arise in a retaliatory arrest and a retaliatory prosecution are present in this type of case. And so... Shouldn't we use, if we were going to reach it, and this gets past the question of whether we should hold the plaintiff to the arguments he made to the district court, but putting that aside, shouldn't we evaluate this case as if it were a prison context, since under Wisconsin, I mean, sorry, under Washington law, this is defined as partial confinement. Shouldn't we analyze this the same way we analyze cases, first amendment cases arising in the prison context? So I'm sorry, I don't understand the court's question related to partial confinement, because he was placed in, he was in total confinement. Shouldn't, well, under the Washington regs, work release is defined as partial confinement, right? So initially, work release, yes, your honor, it's a graduation, so to speak. But regardless, shouldn't we analyze this if we were going to reach what the correct standard is under the first amendment retaliation cases that deal with the prison context? In using the Mount Healthy standard, is that what the court is referring to? Well, I think, for example, in Rhodes v. Robinson in 2005, we lay out a number of- Yes. So, okay, I'm sorry, your honor, I wasn't following the question. So yes, under Rhodes versus Robinson, there's the five elements that an inmate has to prove, and it's our position that Mr. Keswick cannot make out at least two of those. He cannot make out what is the second element, the because of part of it, and he also cannot, he has not been able to prove that the action did not advance a legitimate correctional goal. And your argument on the second one is because it's your claim that these dominoes that fell were mandatory from the violation, so he can't show that it was because of retaliation because it had to have happened? Correct. And on the last, so what is, how do we evaluate the fact that he testified as to number five, that basically there's evidence that she did it as retaliation for his grievance? So, let me back up just a little bit. In regard to the legitimate penological or correctional goal, courts have said that the Department of Corrections has a legitimate goal in rewarding good behavior and discouraging bad behavior, and so there are systems of punishments involved in doing that, and the Washington Court has said that as well. So, to get, I've lost track of your question, Your Honor. I think you were asking me. That's my fault. No, it's my fault. I had two points I was going to make. So, do you mind repeating that part of your question? Let's go with number five. Oh, so you were asking me, and again, if I've gotten off base here, please redirect me. So, on number five, so you're agreeing that if we got to it, we should use Rhodes v. Robinson and the five factors and reasonably advance a legitimate correctional goal. So, what happens if you have, in the state's view, you have undisputed legitimate correctional goal, but a triable issue of fact on whether the subjective motivation of the actor was retaliation? What do you do? So, the only alleged evidence of a retaliatory goal is Mr. Kessick's testimony in his deposition where he said that. Interestingly enough, in none of the five infraction hearings that he had, did he ever allege that Community Corrections Officer Webb had any animus towards him. It was never mentioned. But nonetheless, his deposition counts. Yes. So, however, I would caution that it amounts to the equivalent of like a sham affidavit. It's this conclusory testimony that's contrary to all the other evidence, and all the other evidence points to the conclusion that the action that was taken was an automatic action that Ms. Webb had no involvement with. And if I can, which reminds me of this other point that I felt like was important to correct, because I know Judge Wardlaw, you had mentioned it. Community Corrections Officer Webb was not involved in terminating him from his chemical dependency treatment. She had no involvement in that. It was the automatic piece related to the policies that I referred to earlier. And there is an interesting quote that my friend relies very heavily on from the August 28th hearing. So, the hearing is found in the supplemental excerpts to the record nine. But the quote that they keep referring to is that she didn't want to discharge him. And that's a repeated theme that they hang their hat on. Interestingly enough, just a few minutes later in that exact same hearing, she said, I didn't know you, meaning Mr. Kessick, because he's cross-examining her. I didn't know you broke a big rule. I didn't know that. I thought it was something minor. I had no idea what you did. And then further down, she says, the problem is, Mr. Kessick, you made a choice. And even if I was, and I had the opportunity to talk to somebody in the community, you and I, meaning she and Mr. Kessick, talked about how serious DOSA is, and that you have to follow every rule. You are no longer appropriate for a DOSA sentence. That is part of that same hearing, but it's a part that has been conveniently left out of the testimony that's been provided to this court. And the state's view is that this is a legitimate correctional goal because this is like a last chance. Absolutely. And Your Honor, this, in the Schley case, which has been cited in our briefing, the underlying case, the court of appeals case, Mr. Schley, the actions that he brought is almost, the underlying conduct was different, but he had essentially an 813 violation that resulted in him getting a change of custody classification, and then him being discharged from chemical dependency treatment, and his DOSA getting revoked, the same chain reaction. And the court of appeals there said those are different incidents, that the Department of Corrections did not exceed its authority in responding to each of those things. And so this very same conduct has been ruled on by the Washington courts and has been upheld by the Washington Supreme Court. I see I have six seconds left, and so with that... You're actually over by nine. Oh, my apologies. I'm sorry. Thank you, Your Honors. Thank you, Counsel. Your Honors, even the DOC hearing officer, William Hahn, found that this was the wrong outcome. Right, but we're not looking at outcomes. So if, in fact, your friend is correct that all of these steps were mandatory under the law, then who cares what CCO Webb's motivation was? She had to follow the law, right? Mr. Hahn could not have ruled in Mr. Kessler's favor if, in fact, all these steps were a mandatory chain reaction. He correctly looked at the policies, the same policies that were in place, and said, no, there needs to be a treatment-related reason for discharge from treatment. It's not a mandatory chain reaction. That was long after the incidences, right? He was not guilty of 762 because he wasn't terminated for a treatment reason. Mr. Hahn looked at the same course of conduct, the same decision that was made when he was discharged from treatment, and said he should never have been discharged from treatment in the first place because his policies require a treatment-related reason to do so, and there's no basis here other than the fact that Ms. Webb changed his availability for treatment. And that is not in the policy. The policy says, and I was accused of being grossly misrepresenting the facts, the policy that was cited says that, yes, once someone is terminated from treatment, it's mandatory to seek a 762 hearing. It does not say- For retaliation. She wasn't required to terminate him from treatment when he went back to prison? No. On May 30th, his hearing was over. He was no longer being held pending a hearing because there's no hearings pending. There was no reason to hold him in prison. The custody level was totally in her discretion. No hearing officer ever said, I changed your custody level to full confinement. It was a DOC officer, just like in Bella Reyes, where ICE has full discretion over whether someone's kept on community or home, or in prison. She decided, I'm going to keep you in prison with her supervisor and a joint collective decision. And because I'm holding you in prison, I'm going to, without any sort of policy requirement to do this, because there's no charges pending, I'm then going to make you unavailable for your treatment, make your treatment provider discharge you, and then say, oh, my hands are tied, I have to seek a 7-6-2 infraction. That's very suspicious conduct with no policy requiring that exact course of conduct, especially with allegations that he had complained against her, that she had said she was retaliating, and the person did the same thing, got a slap on the wrist. Okay. Well, thank you very much. Keswick v. Washington State Department of Corrections will be submitted, and this court will leave the session for today. Thank you.
judges: WARDLAW, GOULD, BENNETT